United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATIVE SONGBIRD CARE AND CONSERVATION, et al., | Case No.  13-cv-02265-JST |
| Plaintiffs, | |
| v. | **ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION** |
| RAY LAHOOD, et al., | Re: ECF No. 17 |
| Defendants. | |

## I.    INTRODUCTION

Plaintiffs Native Songbird Care & Conservation, Veronica Bowers, Madrone Audubon Society, Center for Biological Diversity, Marin Audubon Society, and Golden Gate Audubon Society (collectively, "Plaintiffs") have moved for a preliminary injunction against the United States Department of Transportation ("USDOT"), USDOT Secretary Ray LaHood, the Federal Highway Administration ("FHWA"), and FHWA Administrator Victor Mendez (the "Federal Defendants"), and against the California Department of Transportation ("Caltrans") and Caltrans Director Malcolm Dougherty (collectively, "Defendants").  Plaintiff's Motion for a Preliminary Injunction and Supporting Memorandum ("Motion"), ECF No. 17.  Plaintiffs seek to enjoin Defendants from using exclusionary netting at the U.S. 101 Petaluma River and Lakeville Overpass Bridges and from undertaking any other construction work at the U.S. 101 and Petaluma River until further order of this Court.  Id. at 25:3-7.

This Court recognizes its important role in ensuring that federal and state agencies evaluate the potential harm to the environment from human development activities, and protect the

environment from unnecessary or unjustified damage.  However, the standard for injunctive relief is high, and on the evidence before it, the Court can only conclude that the standard has not been met.  Accordingly, as more fully set forth below, the Court will deny the requested injunction.

## II.    BACKGROUND

### A.    Factual Background

The Marin-Sonoma Narrows High Occupancy Vehicle Widening Project ("Project") is a series of improvements to a 16-mile portion of U.S. Route 101 in Marin and Sonoma counties designed to decrease traffic congestion, improve mobility, and address physical and operational deficiencies.  Record of Decision ("ROD"), ECF No. 17-7, at 1.  The Project, jointly proposed by Defendants FHWA and Caltrans, consists of "constructing High Occupancy Vehicle (HOV) lanes, widening and realigning portions of the roadway, construction of new interchanges, upgrading drainage systems, and construction of new frontage roads and bikeways."  Marin-Sonoma Narrows (MSN) HOV Widening Project Final Environmental Impact Report / Final Environmental Impact Statement ("FEIS"), at 1-1.  Part of the project includes Caltrans' replacement of the Petaluma River Bridge and the reconstruction of the Lakeville Overpass Bridge (collectively, the "Bridges").  FEIS, at 3.1-94-97; see also Declaration of Bob Finney ("Finney Decl."), ECF No. 38, at ¶ 6-8.  Construction at both bridges began in December 2012.  Declaration of Christopher Blunk ("Blunk Decl."), ECF No. 35, at ¶ 5.

To fulfill their obligations under the National Environmental Protection Act ("NEPA"), 42 U.S.C.A. § 4321 *et seq.*, and the California Environmental Quality Act ("CEQA"),[1] Cal. Pub. Res. Code § 21000 *et seq.*, Caltrans and FHWA engaged in a public review process involving public scoping meetings and collection of comments between 2001 and 2007.  ROD, at 1, 6-7.  A Draft

---

[1] Since this lawsuit does not raise CEQA issues, the Court refers to the combined DEIS/DEIR and FEIS/FEIR simply as NEPA documents.

2

Environmental Impact Statement ("DEIS") prepared pursuant to NEPA was released and distributed to the public on October 16, 2007, and was followed by a 60-day public comment period. Id. at 7.

The DEIS disclosed potential project impacts to nesting birds generally, as well as the use of exclusionary netting as a mitigation measure to keep birds from nesting on structures where they would be affected by construction. Marin-Sonoma Narrows (MSN) HOV Widening Project Draft Environmental Impact Report/Draft Environmental Impact Statement ("DEIS"), at 3.3-31. In the description of "nesting birds" in the affected environment, the DEIS (and FEIS) noted that "[c]liff swallow nests were observed beneath the Novato Creek Bridge structure and the San Antonio Creek Bridge structure along US 101." DEIS, at 3.3-27; FEIS, at 3.3-31.[2] After receiving comments from members of the public including many of the Plaintiffs in this case, FHWA and Caltrans released the FEIS on August 7, 2009. The FEIS contained Caltrans' response to Plaintiffs' comments on nesting birds generally, saying that "Caltrans would conduct surveys for nesting birds prior to beginning construction on any of the culverts or bridge structures," and that prior "to the nesting season, Caltrans would use exclusionary netting where possible to prevent birds from nesting in or on structures that would be impacted by the project." FEIS, at 3.5-58.

The DEIS and FEIS did not specifically identify a large colony (the "Colony") of cliff swallows that have arrived each spring to nest at the Petaluma River and Lakeville Overpass bridges (the "Bridges") for ten years or more. See Declaration of Lisa Hug ("Hug Decl."), ECF No. 17-4, at ¶¶ 3-4, Declaration of Veronica Bowers, ECF No. 17-5, at ¶ 6. The FEIS also did not specifically identify the exclusionary netting as causing potential impacts to the birds (as opposed to being employed as mitigation for the impacts of the construction itself). Cliff swallows are

---

[2] These bridges are not the Bridges at issue in this case.

United States District Court
Northern District of California

categorized as a "species of least concern" by the International Union for Conservation of Nature, Fed. Defts. Exh. 2, ECF No. 31-2, but as a migratory bird that is native to the United States, they are listed by the U.S. Fish & Wildlife Service ("FWS") as protected under the provisions of the federal Migratory Bird Treaty Act ("MBTA"), 16 U.S.C. § 703 *et seq.*; see also 50 C.F.R. § 10.13(c)(1).

On November 23, 2009, FHWA published a notice in the Federal Register, advising the public of the issuance of a ROD approving the Project and announcing that any claim challenging the Project would be barred unless it was filed in federal court on or before May 24, 2010.  74 Fed. Reg. 61203.  The ROD contained the agencies' responses to some of Plaintiffs' comments on the FEIS.  ROD, at 14-16, 20-21.

In mid-February 2013, Caltrans contractor C.C. Meyers, Inc. installed exclusionary netting on portions of the Bridges.  Blunk Decl., at ¶ 11; Finney Decl., at ¶ 10; Caltrans 6/3/13 Report, Fed. Defts.' Exh. 3D, ECF No. 31-3, at 45.  In March and April, when swallows returned from their migration, numerous cliff swallows became entangled in the netting and many died.  Caltrans 6/3/13 Report, at 43; Bowers Decl., at ¶ 14.  Caltrans reports 65 cliff swallow deaths during those months; Plaintiffs suspect more may have died.  Updated Declaration of Carie Montero ("Updated Montero Decl."), ECF No. 49-1, at ¶ 5; Bowers Decl., at ¶ 14; Complaint, at ¶ 100.  Although some Plaintiffs believe netting is dangerous no matter how it is installed, Plaintiffs and Defendants both believe deaths occurred because the netting was installed too loosely, so that birds were not fully excluded from construction locations at the Bridges but instead became trapped within the netting.  Hug Decl., at ¶ 8; Blunk Decl., at ¶ 14.  After consulting with the FWS and the California Department of Fish & Wildlife, ("CDFW"), Caltrans and its contractor made repairs and modifications to the netting and installed other bird deterrents.  Blunk Decl., at ¶¶ 14-15, 20; Declaration of Carie Montero ("Montero Decl."), ECF No. 33, at ¶ 13.

Since the end of April, Caltrans construction staff and biologists have monitored the Bridges daily and recorded no swallow mortalities in the netting.  Montero Decl., at ¶¶ 15-21; Updated Montero Decl., at ¶ 3.  Plaintiffs, who have regularly documented the activities at the Bridges, have also reported no swallow mortalities from netting during that time.

**B.     Procedural History**

On May 17, 2013, Plaintiffs brought a complaint for declaratory and injunctive relief against the Federal Defendants, Caltrans Director Malcolm Dougherty, and Caltrans.  Complaint for Declaratory and Injunctive Relief ("Complaint"), ECF No. 1.  In it, Plaintiffs brought a claim under NEPA and the judicial review procedures of the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, and a claim under the MBTA and the APA.  Id., at ¶¶ 115-22.  Plaintiffs seek a declaratory judgment that Defendants are violating the MBTA, NEPA and the APA, an order enjoining Defendants from engaging in operations and activities that cause a "take" of cliff swallows at the Bridges, an award of attorney fees and litigation costs, and such other further relief as the Court deems proper.  Id., at p. 24.

Plaintiff filed this motion for a preliminary injunction on May 28, 2013.  Pursuant to the parties' stipulation, the Court agreed to hear argument on the Motion on an accelerated schedule.  See ECF Nos. 46 & 47.  The Federal Defendants and Director Dougherty each filed separate opposition briefs.  Federal Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction, ECF No. 31; Defendant Dougherty's Opposition to Plaintiffs' Motion for Preliminary Injunction, ECF No. 32.  Plaintiffs replied to both opposition briefs on June 20.  Plaintiffs' Reply in Support of their Motion for a Preliminary Injunction ("Reply"), ECF No. 48.

**C.     Legal Standard**

A plaintiff seeking a preliminary injunction "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the

United States District Court
Northern District of California

5

balance of equities tips in his favor, and that an injunction is in the public interest." Am. Trucking Associations, Inc. v. City of Los Angeles, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting Winter v. Nat. Resources Defense Council, 555 U.S. 7, 20 (2008)).  Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Winter, 555 U.S. at 22.

　　　To grant preliminary injunctive relief, a court must find that "a certain threshold showing is made on each factor." Leiva-Perez v. Holder, 640 F.3d 962, 966 (9th Cir. 2011).  Provided that this has occurred, in balancing the four factors, "'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1135 (9th Cir. 2011).

**D.   Jurisdiction**

　　　Since both of Plaintiffs' causes of action arise under federal statutes, this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

**III.   ANALYSIS**

**A.   Likelihood of Success on the Merits**

**1.   MBTA**

　　　The MBTA provides "it shall be unlawful at any time, by any means or in any manner, to pursue, hunt, take, capture [or] kill . . . any migratory bird" unless permitted by the Interior Secretary.  16 U.S.C. §§ 703-704.[3]  The text of the statute indicates that it is a criminal statute enforced by the FWS.  See 16 U.S.C. §§ 706, 707(a), (d).  It creates no private right of action.

_____

[3] Unlike similar language in the Endangered Species Act, this does not include indirect harms through habitat modification.  Seattle Audubon Soc'y v. Evans, 952 F.2d 297, 303 (9th Cir. 1991).

United States District Court
Northern District of California

However, Plaintiffs bring a cause of action under the APA for violations of the MBTA, arguing that, by applying netting that killed migratory birds and may continue to do so in the future without a permit from the FWS, Federal Defendants are acting "not in accordance with law," and therefore are liable under § 706(2)(a) of the APA.  Complaint, at ¶ 122; Motion, at 18:5-19:20.

Plaintiffs can only bring a claim under § 706(2) of the APA to challenge a "final agency action."  5 U.S.C. § 704.  The "final agency action" Plaintiffs challenge is the ROD approving the Project.  Motion, at 18:5; Reply, at 12:14-18.  That claim is barred by the statute of limitations, since it was not brought within 180 days of the date of the ROD.  23 U.S.C. § 139(l)(1).[4]  The FEIS explicitly disclosed the exclusionary netting would be used in construction, and no suit was brought during the limitations period alleging that such an act would take migratory birds.  The ROD did not authorize any take of migratory birds, and the FEIS did not predict any.

Although they do not argue that it qualifies as a "final agency action," Plaintiffs suggest that the application of the netting itself might be challengeable under § 706(2).  First, construction implementation does not fall within the definition of "final agency action": an "agency rule, order, license, sanction, relief, or the equivalent."  5 U.S.C. § 551(13).  Second, the Federal Defendants have issued funding for the Project, but they did not apply the netting; Caltrans' contractor did.  Third, such an interpretation would come very close to nullifying the effect of the statute of limitations, which as "a condition to the waiver of sovereign immunity . . . must be strictly construed."  Irwin v. Dep't of Veterans Affairs, 498 U.S. 89, 94 (1990).

Plaintiffs' counsel at oral argument clarified that it is Plaintiffs' view that the APA and MBTA authorize private suits against federal agencies whenever an agency authorizes a project implemented by third parties that, years later, has the unintended effect of taking even a single migratory bird.  Private suits under the MBTA appear to be rare, and the cases cited by Plaintiffs

---

[4] The statute has been subsequently amended and the limitations period is now 150 days.

United States District Court
Northern District of California

do not support such an expansive interpretation of its scope.  See Humane Soc'y v. Glickman, 217

F.3d 882, 884 (D.C. Cir. 2000) (federal agency proposed to directly undertake action that would

intentionally kill and capture Canada geese); Ctr. for Biological Diversity v. Pirie, 191 F. Supp. 2d

161, 167 (D.D.C. 2002) (U.S. Navy directly proposed live fire training exercises that it

acknowledged would take migratory birds), vacated sub nom. as moot by Ctr. for Biological

Diversity v. England, Case No. 02-5163, 2003 WL 179848, at *1 (D.C. Cir. Jan. 23, 2003); United

States v. Corbin Farm Serv., 444 F. Supp. 510, 536 (E.D. Cal. 1978), aff'd on other grounds, 578

F.2d 259 (9th Cir. 1978) (criminal prosecution against defendant alleged to have poisoned birds).

Plaintiffs' claims against Defendant Dougherty are also unlikely to succeed for similar

reasons.  In addition, while Caltrans is more directly responsible for applying the netting, the APA

only authorizes suits against federal agencies.  See 5 U.S.C. § 701(b)(1).

The MBTA's protections of migratory birds remain in force, subject to the enforcement

authority of the FWS.  But in this situation, there are no serious questions going to the merits of

Plaintiffs' private civil action under the APA for violations of the MBTA.

### 2.    NEPA

Plaintiffs argue that they have demonstrated a substantial likelihood of success on the

merits of their NEPA claim because Defendants failed to take the requisite "hard look" at

environmental impacts on the Colony in the FEIS, and because Defendants have violated the APA

by failing to prepare or consider preparing a Supplemental EIS in light of new information.

#### a.    Adequacy of the FEIS

On this point, the parties are largely arguing past each other.  Both parties acknowledge

that the limitations period to challenge the FEIS has passed.  See 23 U.S.C. § 139(l)(1).  But both

parties also concede that, pursuant to 23 U.S.C. § 139(l)(2), the "Secretary shall consider new

information received after the close of a comment period if the information satisfies the

requirements for a supplemental environmental impact statement under [23 C.F.R. § 771.130]." Plaintiffs characterize this section as "a *de facto* exception to the statute of limitations." See Reply, at 7:18-8:8 (quoting Yorkshire Towers Co., L.P. v. U.S. Dep't of Transp., Case No. 11-CIV-1058-TPG, 2011 WL 6003959, at *4 (S.D.N.Y. Dec. 1, 2011), appeal withdrawn (Apr. 30, 2012).[5] Defendants characterize this section as a establishing a separate and distinct standard for preparing a Supplemental EIS. Both parties agree that Plaintiffs are not barred from bringing a claim under the APA that Defendants have acted in violation of 23 U.S.C. § 139(l)(2) and 23 C.F.R. § 771.130.

However, to the extent that Plaintiffs argue that, independent of the requirements to prepare a Supplemental EIS, they also have the ability, years after the limitations period expired, to challenge the FEIS itself, see Reply, at 11:1-12:15, they have not demonstrated any serious question going to the merits of that claim.

The only two cases Plaintiffs cite to support the concept of "equitably tolling" the deadline to challenge an EIS are inapposite. Wind River Mining Corp. v. United States, 946 F.2d 710, 715 (9th Cir. 1991) was not a NEPA case. In Sierra Club North Star Chapter v. Peters, Civil No. 07-2593 (MJD/SRN), 2008 WL 2152199, at *10 (D. Minn. May 15, 2008), the court tolled the deadline by a *day* because the agency posted a "misleading Federal Register notice" that mis-stated the deadline to file challenges. The North Star court understandably "[could] not conceive of how a one-day delay could cause prejudice" to the agency in that situation. Id. Here, Plaintiffs seek a tolling period of three years without any allegation that Defendants committed any procedural error in posting notice of the deadline to challenge the action. Neither of these cases, even if they were binding precedent applicable to this case, stand for the proposition that a project

---

[5] The Yorkshire Towers court used that phrase, but explicitly held that the deadline to challenge the previous FEIS should not be tolled and that plaintiffs' only recourse was through 23 C.F.R. § 771.130. 2011 WL 6003959, at *5-7. (It also denied that claim. Id., at *7.)

9

opponent may continue to litigate the substantive adequacy of an EIS years after the limitations

period has expired.  As discussed *supra*, this could hardly be considered a "strict[] constru[ction]"

of the statute of limitations.  Irwin, 498 U.S. at 94.

### b.        Failure to Consider Preparing a Supplemental EIS

Plaintiffs' final cause of action under the APA and NEPA is that new information has

come to light that requires Defendants to prepare a Supplemental EIS, or at least make a

reviewable determination whether one is required.  Defendants' counsel argues that the standard

requiring a Supplemental EIS has not been met, but the agencies themselves have yet to make any

formal determination on the record of whether a Supplemental EIS is necessary.

"[A]n agency that has prepared an EIS cannot simply rest on the original document."

Friends of the Clearwater v. Dombeck, 222 F.3d 552, 557 (9th Cir. 2000).  "The agency must be

alert to new information that may alter the results of its original environmental analysis."  Id.

If the new information is sufficient to show that the remaining action will "'affec[t] the quality of

the human environment' in a significant manner or to a significant extent not already considered, a

supplemental EIS must be prepared."  Marsh v. Or. Natural Res. Council, 490 U.S. 360, 374

(1989) (citing 42 U.S.C. § 4332(c)).

Pursuant to the FHWA's environmental review regulations, "an EIS shall be supplemented

whenever the Administration determines that: (1) Changes to the proposed action would result in

significant environmental impacts that were not evaluated in the EIS; or (2) New information or

circumstances relevant to environmental concerns and bearing on the proposed action or its

impacts would result in significant environmental impacts not evaluated in the EIS."  23 C.F.R. §

771.130(a).

The APA contains two separate provisions for judicial review of federal agency action.

The more familiar avenue is through § 706(2), which permits, *inter alia*, a reviewing court to set

aside an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." § 706(2)(a). Section 706(2) only applies to a "final agency action[s]," and therefore it generally occurs when an agency has made some final written reviewable determination, presumably after utilizing its pertinent expertise. Courts, including the Ninth Circuit, "have upheld agency use of SIRs [Supplemental Information Reports] and similar procedures for the purpose of determining whether new information or changed circumstances require the preparation of a supplemental EA or EIS." Idaho Sporting Cong. Inc. v. Alexander, 222 F.3d 562, 566 (9th Cir. 2000).

On the other hand, "when a court is asked to review agency inaction before the agency has made a final decision, there is often no official statement of the agency's justification for its actions or inactions." San Francisco BayKeeper v. Whitman, 297 F.3d 877, 886 (9th Cir. 2002). In such cases, review is available through Section 706(1), through which a reviewing court may "compel agency action unlawfully withheld or unreasonably delayed."

Hedging their bets, Plaintiffs invoke both sections 706(1) and 706(2). The hedge is a prudent one. Review of an agency's determination that a EIS "need not be supplemented . . . is controlled by the 'arbitrary and capricious' standard of § 706(2)(a)." Marsh, 490 U.S. at 376. However, "an action to compel an agency to prepare an SEIS . . . is not a challenge to a final agency decision, but rather an action arising under 5 U.S.C. § 706(1)." Dombeck, 222 F.3d at 560.

When the agency has prepared a written determination that a court can review, the distinction between the two subsections makes little difference. Either the determination itself is a final agency action reviewable pursuant to 706(2)(a), or else the court reviews the SIR to determine whether the agency has "unlawfully withheld" the preparation of a Supplemental EIS pursuant to 706(1). In either case, the standard is the same: "[w]hen new information comes to

light the agency must consider it, evaluate it, and make a reasoned determination whether it is of such significance as to require" a Supplemental EIS.  N. Idaho Cmty. Action Network v. U.S. Dep't of Transp., 545 F.3d 1147, 1155 (9th Cir. 2008) (quoting Dombeck, 222 F.3d 552, 558 (9th Cir. 2000) (quoting Warm Springs Dam Task Force v. Gribble, 621 F.2d 1017, 1024 (9th Cir. 1980)).  The court's inquiry must be "searching and careful," but "narrow," and the "agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive."  Marsh, 490 U.S. at 378.

But the situation is more difficult when, as here, the agency has yet to issue a SIR or any other written evaluation of the new information.  There has been no "final agency action."  So the court must determine whether the agency has "unreasonably delayed or unlawfully withheld" its determination, or whether the lack of a SIR demonstrates that the agency has "unreasonably delayed or unlawfully withheld" the Supplemental EIS.  In doing so, the court cannot defer to agency expertise because the agency has yet to utilize it.  While Defendants' counsel argue that the standard requiring preparation of Supplemental EIS has not been met, it "is a fundamental principle of administrative law that "courts may not accept . . . counsel's *post hoc* rationalizations for agency action."  Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 50 (1983); see also Dombeck, 222 F.3d at 558 ("although the Forest Service now can point to data that, if timely considered, would have shown that the new information did not require an SEIS, this does not demonstrate that the *Forest Service* complied with NEPA, which demands timely and reasoned *agency* action") (emphases added).

Plaintiffs appear to suggest that in this situation, if *any* new information of *any* kind has come to light, agencies are in *per se* violation of the APA until they issue a SIR or other expert

determination evaluating the new information. Motion, at 14:12-14; Reply, at 8:24-9:2.[6]  This

cannot be the rule.  To require an agency to "supplement an EIS every time new information

comes to light after the EIS is finalized . . . would render agency decisionmaking intractable,

always awaiting updated information only to find the new information outdated by the time a

decision is made."  Marsh, 490 U.S. 360 at 373.  The same is true, though to a lesser extent, if an

agency were required to prepare a SIR explaining why it would *not* perform a Supplemental EIS

every time even the slightest new information came to the light over the course of a multi-year

project.  Allowing such an approach would potentially stymie the completion of virtually any

project by periodically sending the agency back to the drawing board to analyze every piece of

new information it had not yet explicitly discussed.

Unless a SIR is required for literally every piece of new information, no matter how

---

[6] The published authority on this issue generally demonstrates that in considering an agency's
failure to prepare a Supplemental EIS, courts review a written determination or at least an  expert
determination.  See Presidio Golf Club v. Nat'l Park Serv., 155 F.3d 1153, 1162-63 (1998) (Park
Service prepared EA); Marsh, 490 U.S. at 379 (the Army Corps "responded to the claim that these
documents demonstrate the need for supplementation of the FEISS by preparing a formal
Supplemental Information Report"); Price Road Neighborhood Ass'n, Inc. v. U.S. Dep't of Trans.,
113 F.3d 1505, 1509 (9th Cir. 1997) (FHWA conducted a written reevaluation pursuant to 23
C.F.R. § 771.129(c)); Environmental Protection Information Center v. U.S. Forest Serv., 451 F.3d
1005, 1011 (9th Cir. 2006) (FWS prepared an EA and a biological opinion); N. Idaho Cmty.
Action Network v. U.S. Dep't of Transp., 545 F.3d 1147, 1157 (9th Cir. 2008), ("the agencies
prepared both an EA and a reevaluation"); Headwaters, Inc. v. Bureau of Land Mgmt., Medford
Dist., 914 F.2d 1174, 1180 (9th Cir. 1990) (the BLM prepared an EA, and in considering
information provided after the EA, "BLM credited the conclusions of its own experts in deciding
that the additional information was not significant").  But in all likelihood, this uniformity is
explained by the timeline for appellate review.  In an appeal that produces a published decision, an
agency would have time to attempt to moot the issue by producing a SIR or other document after
the litigation began.  See, e.g., Dombeck, 222 F.3d at 561 ("among the documents prepared since
the inception of this litigation are a new SIR, several Biological Assessments and Biological
Evaluations, and other documents, all of which contain additional data and analyses").  Dombeck
comes closest to suggesting that evaluation is always required of all new information, but even
that case the court emphasized that the agency had been confronted with "important information"
and recognized that what NEPA requires is "timely and reasoned agency action."  Id. at 559.  The
question of whether a written determination is required for all new information is a question
capable of repetition at the district court level, yet evading appellate review.

recently received or how relevant to the project, the agency does not "unlawfully withhold" its determination if it has not yet had time to prepare it or if the information fails to meet a minimal threshold relevance level.  Nor can failure to prepare a SIR in such circumstances constitute the "unreasonabl[e] delay[] or unlawful[] withh[olding]" of a Supplemental EIS.

But on the other hand, neither can courts abdicate their responsibility to ensure that the important environmental goals of NEPA are effectuated.  Commentators note that one of the primary functions of judicial review of agency action is an "expertise-forcing" analysis.  Jody Freeman & Adrian Vermeule, Massachusetts v. EPA: From Politics to Expertise, 2007 Sup. Ct. Rev. 51, 52 (2007).  This function is particularly important when an agency "decides not to decide," potentially circumventing Congress' statutory command.  See id. at 85-87.[7]  It would circumvent one of NEPA's main goals to permit agencies to avoid "tak[ing] a hard look at the proffered evidence" of continuing environmental effects.  Marsh, 490 U.S. at 385.  If an agency has had time to respond to new information, and declines to make any expert determination, it foregoes any claim of deference and must submit to a court's *de novo* determination of whether a Supplemental EIS is required.

Courts are well positioned to determine legal aspects of this question *de novo* (for example, whether certain information is "new," and whether there has been a "change in the proposed action").  But various other aspects of the decision -- for example, estimating the likelihood that netting will significantly impact cliff swallows -- are "a classic example of a factual dispute the resolution of which implicates substantial agency expertise."  Marsh, 490 U.S. at 376.  Courts are not very well situated to make such determinations.  But where there is no expert determination on the record, courts must make them the best they can, while being mindful of NEPA's expressed

_____

[7] As Freeman & Vermeule put it, quoting a *New Yorker* cartoon, the agency cannot respond to citizens' requests for a determination by saying "How about never?  Does never work for you?"

United States District Court
Northern District of California

purpose of promoting environmental disclosure.

Turning to the facts of this case, Plaintiff's motion states that the swallows' "arrival and subsequent capture, death and dispersal this nesting season" is new information that "would result in significant environmental impacts not evaluated in the EIS." Motion, at 13:18-20; 23 C.F.R. § 771.130(a). Defining significance for NEPA purposes "requires considerations of both context and intensity," and in determining "intensity," agencies consult ten listed criteria. 40 C.F.R. § 1508.27. Plaintiffs state that four of these factors -- "unique characteristics of the geographic area," the "degree to which the effects on the quality of the human environment are likely to be highly controversial," the "degree to which the action may establish a precedent for future actions," and "whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment" -- weigh in favor of a significance finding.

Some of these factors may weigh in that direction to a limited degree. But Plaintiffs have not demonstrated that the overall consideration of all relevant factors is likely to rise to the level considered "significant." For example, in considering "context," Plaintiffs have not demonstrated that the death of 65 swallows, as impactful as it was to many people, rises to a level considered significant at various levels "such as society as a whole (human, national), the affected region, the affected interests, and the locality." 40 C.F.R. § 1508.27(a). Other considerations in the "impact" level weigh against a significance finding, for example, "[t]he degree to which the action may adversely affect an endangered or threatened species or its habitat." 40 C.F.R. § 1508.27(b)(9).

More importantly, the question is not whether the deaths that occurred in March and April are themselves significant impacts. The capture and death of swallows in 2013 are, by definition, facts not considered in the original EIS. The relevant consideration is whether the possibility of such events was not known to the agency at the time and whether it might have changed the

United States District Court
Northern District of California

agency's impact conclusion if it had been. Plaintiffs have not demonstrated that the possibility that netting could, if installed poorly, kill swallows, would change the agencies' conclusion that the construction would not significantly impact nesting birds if appropriate mitigation were employed.

In their Reply and at oral argument, Plaintiffs also invoked Plaintiffs' expert reports that the Project may be having a negative effect on the Colony by dispersing swallows from favored nesting sites or by subjecting them to construction impacts. It is not clear from the record how long the agencies have had this information and whether they have had a reasonable opportunity to review it and determine whether it is significant.[8] In any case, Plaintiffs have not demonstrated that this information would necessarily change the EIS' conclusion that construction activities would have a less-than-significant effect on nesting birds if appropriately mitigated.

It is true that the FEIS did not disclose the Colony's springtime and summer presence at the Bridges, and it is also true that a Caltrans spokesman reportedly stated to the press that the swallows' arrival in large numbers was unanticipated. Peter Fimrite, Swallows may delay Petaluma bridge work, Apr. 29, 2013, *San Francisco Chronicle*, ECF No. 17-4. This does raise questions about whether the Colony's presence was known to Defendants at the time that they prepared the FEIS.[9]

The Court has undertaken its own review of cases involving the discovery of new information, and was unable to find a case requiring an agency to evaluate new information of the

---

[8] The Court does not mean to suggest that Plaintiffs must necessarily provide this information to Defendants to demonstrate that Defendants must consider preparing a Supplemental EIS. "It is the agency, not an environmental plaintiff, that has a 'continuing duty to gather and evaluate new information relevant to the environmental impact of its actions,' even after release of an EIS." Dombeck, 222 F.3d at 449 (quoting Warm Springs, 621 F.2d at 1023). But knowing when and whether the information came to light is relevant to the Court's determination of whether the agency has "unreasonably delayed or unlawfully withheld" a required agency action.

[9] It is not, however, determinative of that fact. Lead agencies are not required to specifically list in an EIS every appearance of every species known to inhabit an area.

magnitude presented here.  Taken as a whole, Plaintiffs have not established a substantial

likelihood of success on the merits of their claims that a Supplemental EIS is required in this

situation.  At best, they have established serious questions going to the merits of that claim.

**B.     Likelihood of Irreparable Harm**

      **1.     Irreparability**

Plaintiffs assert that, in the absence of injunctive relief, they will be harmed through

diminished opportunities to look, enjoy, and study wildlife, and will suffer emotional and aesthetic

injury from seeing the swallows subjected to stress and harm.  Motion, at 19:2.  This sort of injury

is irreparable.  See Cottrell, 632 F.3d at 1135 ("environmental injury, by its very nature, can

seldom by adequately remedied by money damages"); see also Sierra Club v. Bosworth, Case No.

05-civ-00397-CRB, 2005 WL 3096149, at *11 (N.D. Cal. Nov. 14, 2005) ("environmental

damage cannot be undone, whereas economic injury can almost always be rectified").   For very

good reasons, courts including this one recognize a special solicitude for harms to the

environment, and the attendant injury those harms inflict on people who care for it.  The question

presented in this motion is not whether the type of injury Plaintiffs have alleged is sufficiently

weighty in magnitude, but whether the court is in a position to determine that it is likely to occur

in the future.

      **2.     Likelihood**

"Plaintiffs seeking preliminary relief . . . [must] demonstrate that irreparable injury is *likely*

in the absence of an injunction."  Winter, 555 U.S. at 22 (emphasis in the original).  "[A]

preliminary injunction will not be issued simply to prevent the possibility of some remote future

injury."  Id.  The claim of harm that initiated this suit stems from the faulty netting that caused

swallows to be trapped, injured and killed in March and April.  Motion, at 18-7-19:1; Complaint,

at ¶ 74.  On the basis of evidence acknowledged by all parties, the Court has no trouble concluding

that this caused Plaintiffs significant harm in the past.  But the evidence does not support the claim that these harms are sufficiently likely to continue occurring in the future to the degree necessary to invoke the extraordinary remedy of injunctive relief.

Defendants acknowledge that significant swallow deaths occurred at the Bridges in March and April of this year.  But since that time, Caltrans and its contractor performed significant repairs on the netting, and are undergoing continuing maintenance and monitoring.  They report that these efforts have at least dramatically decreased, and may have eliminated, the rate of swallow mortality.  After recording 65 swallow mortalities at the Bridges in March and April, Caltrans has conducted daily counts and has not recorded a single swallow mortality in the netting since April 28.  Between that date and the date of the hearing on this motion, Caltrans has recorded only a single bird mortality at the Bridges (a house finch).  Plaintiffs, who have been monitoring the Bridges closely and filed numerous declarations of their observations there, have also reported no swallow mortalities in that time.

In their Reply, Plaintiffs cite only a single piece of evidence that faulty netting continues to pose a danger of trapping swallows after the repairs.  One of Plaintiff's experts, after visiting the Bridges, reported that "there are areas where the netting is billowing and flapping in the air, risking continued trapping, entanglement, and death," and observed and photographed a "dangling net . . . immediately next to over fifteen active nests," which in the expert's opinion poses "grave risks to the swallows."  Supplemental Declaration of Lisa Hug, ECF No. 48-3, ¶ 6.[10]  This testimony provides reason for continuing vigilance.  But even a very thorough effort to repair and maintain netting cannot be expected to achieve perfection.  The Court has carefully reviewed all of Plaintiffs' other evidence on this point.  See, e.g., Hug Decl., at ¶¶ 9, 18; Declaration of Charles R.

---

[10] At oral argument, Plaintiffs' counsel identified this as the most compelling piece of evidence that improperly installed netting continues to pose a threat of trapping and killing swallows.

United States District Court
Northern District of California

United States District Court
Northern District of California

Brown, Ph.D, ECF No. 17-3, at ¶ 17.  It does not establish a likelihood of significant future harm in the face of the uncontradicted numbers showing that swallow mortality appears to have ceased.

Based primarily on the declarations of two ornithological experts, one who has visited the Bridges and another who has not, Plaintiffs also argue that additional hazards besides faulty netting are likely to cause future harm.  They argue that netting poses a threat to birds for reasons of other than trapping – for example, by excluding swallows so that they then must nest in less-than-ideal locations.  Hug Decl., at ¶ 19.[11]  Combined with the effects of the construction itself, Plaintiffs argue that these harms are likely to cause the Colony to abandon the site.  Hug Decl., at ¶ 16; Supplemental Declaration of Dr. Charles R. Brown ("Brown Suppl. Decl."), at ¶¶ 5-6.

The Court cannot determine that Plaintiffs will suffer harm from the maintenance of properly installed, well-maintained netting without attempting to adjudicate a battle of experts.  Marie Strassburger, the regional chief in FWS's Division of Migratory Birds and Habitats states that it is her division's opinion "that the netting is appropriate and should remain in place if construction activities continue," because removing the netting will harm nesting birds.  Declaration of Marie Strassburger, at ¶¶ 8-9.  A leading expert on cliff swallow nesting deterrence, whose work has been cited by both parties, recognizes that "[t]he generally accepted method to prevent cliff swallows from nesting is exclusion by netting," and that while alternative approaches have been studied, they are not proven to be completely effective and "do not fully solve the problem faced by departments of transportation."  Conklin et al., <u>Deterring cliff-swallow nesting on highway structures using bioacoustics and surface modifications</u>, *Human-Wildlife Conflicts*

---

[11] This harm could not be remedied by attempting other methods to deter swallows from nesting on the Bridges.  It could only be remedied by refraining from doing any construction at the Bridges during the swallows' nesting season from April to August.  This would only leave one month of each year in which Caltrans could perform in-water work on the bridge, since Caltrans' permit from CDFW only permits in-water work at the Petaluma Bridge between July 1 to September 30 in order to protect the threatened California Longfin Smelt.  <u>See</u> Blunk Decl., at ¶ 10.

3(1); 93-102, Spring 2009, ECF No. 17-18; Declaration of Michael J. Delwiche, ECF No. 41, at ¶¶ 8-10.

Plaintiffs also contend that construction activities themselves are injurious to the Colony. Reply, at 17:11-14.  But the FEIS disclosed specifically that heavy construction activity would occur at the Bridges, and after engaging with the public and consulting the relevant experts in the federal and state governments, the lead agencies determined that construction would not cause significant impacts to nesting birds provided that appropriate mitigation take place.  The Court cannot conclude otherwise without taking the opinion of one expert over another.

In addition, to find irreparable harm, a court must find not find not just that a plaintiff will suffer, but that they "will suffer an irreparable loss of legal rights."  <u>Sierra On-Line, Inc. v. Phoenix Software, Inc.</u>, 739 F.2d 1415, 1422 (9th Cir. 1984).  The FEIS is presumed valid, and the actions agencies take pursuant to the ROD are authorized by law.  Defendants' only arguably viable claim is that Defendants must consider whether new information requires preparation of a Supplemental EIS.  Only if, as a result of that inquiry, the agencies determine that a Supplemental EIS is necessary will the harms Plaintiffs suffer from construction be the type protected by law.

### 3.      Heightened Standard for Mandatory Injunctions

Even assuming that Plaintiffs could show that repaired netting is likely to cause them significant future harm, this harm would not be remedied by the first prong of Plaintiffs' request for injunctive relief (that construction work cease at the Bridges).  To remedy the harm allegedly caused by the netting, the Court would also need to grant the second prong of Plaintiffs' proposed injunction: that Defendants take proactive steps to remove the netting from the Bridges.

The Ninth Circuit, amongst other circuits, adopts a "heightened standard with respect to mandatory injunctions."  <u>Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Trust</u>, 636 F.3d 1150, 1161 (9th Cir. 2011) <u>cert. denied</u>, 132 S. Ct. 756 (U.S. 2011).  To be granted a mandatory

injunction, Plaintiffs must show that "extreme or very serious damage will result" to their claimed interests.  Id., 636 F.3d at 1160.

According to Dougherty, installing the nets took 10 days, and removing them would take 1-2 weeks.  Blunk Decl., at ¶¶ 11, 21.  To remove the netting would require night work in moving traffic, and workers would be suspended in a basket over the edge of the bridge 75 feet above the water at the Petaluma site and up to 25 feet above ground at the Lakeview site.  If Plaintiffs do not succeed on their claims, all of this work would need to be done, and then repeated again to reinstall the netting.

As a demand that Defendants take a proactive action, as opposed to refrain from taking further action, the second prong of Plaintiff's proposed injunction certainly appears to be a "mandatory" injunction.  Plaintiffs contend otherwise, citing Dep't of Recreation for State of Calif. v. Bazaar Del Mundo, Inc., 448 F.3d 1118, 1124 (9th Cir. 2006)'s statement that the "*status quo* is not simply any situation before the filing of the lawsuit, but rather the last uncontested status that preceded the parties' controversy."  Plaintiffs characterize the *status quo ante litem* as the status before Defendants installed the netting, and therefore they argue that it would not be a "mandatory injunction" to restore that state of affairs.

Bazaar Del Mundo cites the definition of the *status quo litem*, but does not discuss what constitutes a "mandatory injunction."  In the case Bazaar Del Mundo cites for that definition, GoTo.Com, Inc. v. Walt Disney Co., 202 F.3d 1199, 1210 (9th Cir. 2000), the Ninth Circuit found that an injunction that enjoined defendants from using an allegedly protected trademark was, unsurprisingly, not a mandatory injunction.  See GoTo Com, Inc. v. Walt Disney Co., Case No. Civ-99-1674 TJH (RC), 1999 WL 1043278, at *1 (C.D. Cal. Nov. 12, 1999) aff'd sub nom. GoTo.com, Inc., 202 F.3d at 1199 (9th Cir. 2000).

In Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co., 571 F.3d 873, 879 (9th Cir.

2009), the Ninth Circuit discussed the distinction in detail, and reaffirmed the standard from

Bazaar del Mundo.  In Marlyn, a defendant had distributed and sold a product that infringed a

plaintiff's trademark.  The district court "ordered that [the defendant] recall its product and give

restitution to customers who had bought its product."  571 F.3d at 879.  On Plaintiffs' view, this

would not seem to be a mandatory injunction, since the court's order merely restored the last

uncontested status before the defendant began selling the trademarked product.  But the Ninth

Circuit did not see it that way, holding that the "[r]emedy went beyond the *status quo* pending

litigation and instead required [a defendant] to take the affirmative step of recalling its product."

Id.  "Thus, the recall order at issue did not operate simply to preserve the *status quo*, or to restrain

[defendant] from further acts of possible infringement, because it involved products no longer

within [defendant's] possession."  Id.

Plaintiffs' second request for injunctive relief is much more comparable to a mandatory

injunction than a prohibitory one.  The gravamen of Plaintiffs' complaint reveals that the parties'

dispute began when faulty netting began killing large numbers of birds.  Complaint, at ¶¶ 71-92.

While the Court understands that Plaintiffs also seek to challenge the maintenance of the nets

themselves, it is not necessary that the Court order that act undone "to preserve the power of the

court to render a meaningful decision."  Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2948 (2d

ed.)  Nor is this a situation in which "a defendant with notice in an injunction proceeding

completes the acts sought to be enjoined the court."  Porter v. Lee, 328 U.S. 246, 251 (1946).

Defendants proceeded to restore the nets before they had any notice of this suit.

Plaintiffs are "seeking affirmative relief through a Rule 65(a) order to prevent some future

injury."  Wright & Miller, § 2948.  "[T]his fact alone should not bar relief."  Id.  But since

Plaintiffs want this Court to "require[] affirmative conduct," their request "is subject to heightened

scrutiny and should not be issued unless the facts and law clearly favor the moving party."  Dahl

v. HEM Pharmaceuticals Corp., 7 F.3d 1399, 1403 (9th Cir. 1993).  The question of whether properly installed netting will harm the birds is vigorously contested, and the evidence that such netting will trap and kill birds in significant numbers is essentially speculative.  Therefore, the Court cannot conclude that Plaintiffs have demonstrated that they are likely to suffer the sort of "extreme or very serious damage" that permits the Court to order Defendants to begin taking affirmative conduct pending litigation on the merits.

### 4. "Procedural" Injury

Finally, Plaintiffs also assert, quoting Baykeeper v. U.S. Army Corps of Engineers, Case No. Civ. S-06-1908 FCD/GGH, 2006 WL 2711547, at *15 (E.D. Cal. Sept. 20, 2006), that "the procedural injury caused by the [agency's] unlawful failure to prepare an EIS constitutes irreparable harm."  The Court does not agree with Federal Defendants that this assertion has necessarily been weakened by Summers v. Earth Island Inst.'s holding that "deprivation of a procedural right without some concrete interest that is affected by the deprivation - a procedural right *in vacuo* - is insufficient to create Article III standing."  555 U.S. 488, 496 (2009). Summers' rule defines the type of injury-in-fact necessary to establish standing, not the type of irreparable harm necessary to obtain injunctive relief.

But in Baykeeper, the court rested its conclusion of irreparable harm not solely on an alleged "procedural" injury but also on demonstrated risks to endangered and threatened species. 2006 WL 2711547, at *15-16.  If Plaintiffs assert that a "procedural" injury suffices to grant plaintiffs irreparable harm even in the absence of a threat to a species, it would seem that anyone challenging an agency's failure to prepare an EIS or a Supplemental EIS (or, indeed, to take any action allegedly required by NEPA) would automatically satisfy one fourth of the requirements for achieving a preliminary injunction.  It is doubtful that this is the rule of this circuit.  In recognizing the concept of a "procedural" injury, Baykeeper cited two Ninth Circuit cases.  In the first case,

Nat'l Parks & Conservation Ass'n v. Babbitt, 241 F.3d 722, 737, n. 18 (9th Cir. 2001), the pertinent holding appeared in a footnote, and the opinion's overall approach to injunctive relief was abrogated by Monsanto Co. v. Geertson Seed Farms, --- U.S. ---, 130 S. Ct. 2743, 2757 (2010). In the second case, Save Our Sonoran, Inc. v. Flowers, 408 F.3d 1113, 1124 (9th Cir. 2005), the Ninth Circuit actually said that is "doubtless" accurate to observe that "there is no presumption of irreparable harm in procedural violations of environmental statutes."

Even if Plaintiffs were "automatically" able to establish irreparable harm for asserting a NEPA violation, as discussed immediately *infra*, the tenuousness of Plaintiffs' claims of non-procedural future harm substantially undermine Plaintiffs' arguments on the third and fourth factors of the preliminary injunction analysis.

## C.    Balancing of the Equities and the Public Interest

"The third and fourth factors, harm to the opposing party and the public interest, merge when the Government is the opposing party." Nken v. Holder, 556 U.S. 418, 420 (2009). "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." Weinberger v. Romero–Barcelo, 456 U.S. 305, 312 (1982). "A court of equity may tailor its relief with a critical and balanced view of the ramifications of its decision, including in the overall public interest a consideration of the interests of those not before the court." Blair v. Freeman, 370 F.2d 229, 239 (D.C. Cir. 1966).

Since Plaintiffs have not demonstrated a substantial likelihood of success, but at best have demonstrated serious questions going to the merits, injunctive relief is only permissible if the balance of equities tips "sharply" in Plaintiffs' favor. See Cottrell, 632 F.3d at 1135.

On their side of the equities, Plaintiffs assert the harms discussed *supra*: diminished opportunities to enjoy wildlife, and emotional and aesthetic injury from seeing swallows subjected

to stress and harm.  These are serious considerations, worthy of serious weight.  In addition, the public policy of environmental disclosure contained within NEPA weighs in favor of injunctive relief.

Against these considerations, the Court must weigh the harm to the public of delaying for at least a year an important transportation infrastructure project with significant direct and collateral economic benefits.  Unlike Bair v. Calif. Dept. of Transp., Case No. 10-Civ-04360 WHA, 2011 WL 2650896, at *8 (N.D. Cal. July 6, 2011), the case on which Plaintiffs substantially rely, construction is not six months off.  Construction has been underway since December 2012, and an important phase of in-water work is due to begin in days.  Blunk Decl., at ¶ 5.  The timeline for litigation on the merits will not permit this construction to occur this year because, pursuant to its permit from CDFW, Caltrans must conduct its in-water work within a 90-day window that is necessary to avoid potential harm to the California Longfin Smelt, a California protected species.  Finney Decl., at ¶ 18; Blunk Decl., at ¶ 10.  This is not a case in which wildlife interests fall entirely on one side of the ledger.

Numerous citizens have interests that will be harmed by delaying the Project for a year, including the taxpayers of Sonoma County who supported a sales tax increase to fund its completion.  While Plaintiffs' expert disputes the estimates of Caltrans officials, it is not unreasonable to estimate that delaying a year would cost state and local governments millions of dollars, as well as cost many workers their jobs.  Compare Finney Decl., at ¶¶ 20-22 with Declaration of William M. Lider, B. Sc. Eng., ECF No. 48-1, at ¶¶ 16-17.  And the costs are not purely economic, since an injunction would forestall for a year the public safety and transportation efficiency goals of the Project.[12]

---

[12] In Idaho Sporting Cong. v. Rittenhouse, 305 F.3d at 974 (9th Cir. 2002), the Ninth Circuit enjoined the U.S. Forest Service from proceeding with certain timber sales until it performed

All of these substantial public harms might well be worth bearing to avert a likely and significant threat to the environment, especially to a threatened or protected species or to a sensitive natural community.[13]  But for the reasons just discussed, this is not a case in which the Court can conclude that these harms are demonstrably likely to occur.  The balance of equities does not tip, much less tip sharply, in Plaintiffs' favor.

The Court takes seriously the concerns and interests of those who enjoy wildlife, and it takes seriously its obligation to ensure that the federal laws that protect the environment are fully effectuated.  But under the law, a preliminary injunction is reserved for extraordinary cases in which demonstrably likely future harms can only be averted by the extraordinary remedy of injunctive relief.  This is not such a case.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

---

analysis required under the Forest Act and NEPA.  In addressing the defendant's harm in a preliminary injunction analysis, the court found that "[b]ecause we ask only that the Forest Service conduct the type of analysis that it is required to conduct by law, an analysis it should have done in the first instance, it is difficult to ascertain how the Forest Service can suffer prejudice by having to do so now."  Id. (quoting Neighbors of Cuddy Mountain v. U.S. Forest Serv., 137 F.3d 1372, 1382 (9th Cir. 1998)).  While that logic is appealing, here it is not just the harms to an agency as an entity that are at issue.  It is the harms to the public that will accrue from significantly delaying infrastructure investments that affect an entire region.

[13] Harm to any species impacts people who care for wildlife and also has often undetectable influence on the delicate ecosystem in which we live.  But in balancing public interests, it is appropriate to note that while the cliff swallow is protected under the MBTA, it is a common and well-distributed species that has not been listed as threatened or endangered by either the federal or state governments.

United States District Court
Northern District of California

**IV.     CONCLUSION**

Plaintiffs have not carried their burden of demonstrating that a preliminary injunction is permissible.  The motion is DENIED.

**IT IS SO ORDERED**.

Dated:  July 2, 2013

_____
JON S. TIGAR
United States District Judge

United States District Court
Northern District of California