UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

NATIVE SONGBIRD CARE AND CONSERVATION, et al.,

Plaintiffs,

v.

ANTHONY FOXX, et al.,

Defendants.

Case No. 13-cv-02265-JST

**ORDER DENYING MOTION TO STAY AND ESTABLISHING PROCEDURE FOR SUMMARY JUDGMENT BRIEFING**

Re: ECF No. 67

## I.  INTRODUCTION

Defendants Anthony Foxx and Victor Mendez, in their capacities as U.S. Transportation Secretary and Federal Highway Administration ("FHWA") Administrator (collectively, "the Federal Defendants"), and California Department of Transportation ("Caltrans") Director Malcolm Dougherty, have jointly moved to stay all proceedings in this action for 120 days. For the reasons described herein, the Court hereby DENIES the motion to stay, and ORDERS the parties to continue litigation of this case.

## II.  BACKGROUND

### A.  Factual and Procedural History

The facts which precede the Court's July 2, 2013 order in this case are only briefly summarized herein. Those facts are described more fully in the July 2 order. Order Denying Motion for Preliminary Injunction ("Inj. Order"), ECF No. 53, at 2:6-5:4, 2013 WL 3355657, at *1-3 (N.D. Cal. July 2, 2013).

This case concerns the Marin-Sonoma Narrows (MSN) HOV Widening Project Final Environmental Impact Report / Final Environmental Impact Statement ("FEIS"). That FEIS, issued in 2009 by FHWA and Caltrans, authorized the widening and improvement of a portion of U.S. Highway 101, including the replacement of the Petaluma River Bridge and the reconstruction of the Lakeville Overpass Bridge (collectively, "the Bridges"). Id. at 2:6-21, 2013 WL 3355657,

at *1 (citing FEIS, at 3.1-94-97). The Draft EIS, and the response to Plaintiffs' comments in the FEIS, disclosed that exclusionary netting would be used at construction sites frequented by nesting birds. Id. at 3:4-19, 2013 WL 3355657, at *2 (citing FEIS, at 3.5-58).

The DEIS and FEIS did not specifically identify a large colony (the "Colony") of cliff swallows that have arrived each spring to nest at the Petaluma River and Lakeville Overpass bridges (the "Bridges") for ten years or more. Id. at 3:20-24, 2013 WL 3355657, at *2. The FEIS also did not specifically identify the exclusionary netting as causing potential impacts to the birds (as opposed to being employed as mitigation for the impacts of the construction itself). Id. at 3:23-26, 2013 WL 3355657, at *2.

In mid-February 2013, Caltrans contractor C.C. Meyers, Inc. installed exclusionary netting on portions of the Bridges. Id. at 4:12-15, 2013 WL 3355657, at *2. In March and April, when swallows returned from their migration, numerous cliff swallows became entangled in the netting and many died. Id. at 4:14-16, 2013 WL 3355657, at *2. Caltrans reports 65 cliff swallow deaths during those months; Plaintiffs suspect more may have died. Id. at 4:16-19, 2013 WL 3355657, at *2.

After consulting with the FWS and the California Department of Fish & Wildlife, ("CDFW"), Caltrans and its contractor made repairs and modifications to the netting and installed other bird deterrents. Id. at 4:23-27. On April 22 and 25, different counsel for Plaintiffs wrote to the Defendants to request that the netting be removed, that construction be halted, and that a Supplemental EIS be prepared. Amended Complaint, ECF No. 56. ¶ 102. Defendants responded by letter on April 25, May 1, and May 15, stating that they believed their repairs had solved the problem, that they would not remove the netting or halt construction, and pointed to the EIS' disclosure of the use of netting. Id., ¶¶ 103-08.

Since the end of April, Caltrans construction staff and biologists monitored the Bridges daily and recorded no swallow mortalities in the netting from that point until late June. Inj. Order, at 5:1-3, 2013 WL 3355657, at *2. Plaintiffs, who have regularly documented the activities at the Bridges, have also reported no swallow mortalities from netting during that time. Id., at 5:3-5, 2013 WL 3355657, at *2.

2

Plaintiffs Native Songbird Care & Conservation, Veronica Bowers, Madrone Audubon Society, Center for Biological Diversity, Marin Audubon Society, and Golden Gate Audubon Society (collectively, "Plaintiffs") brought the initial complaint in this action on May 17, 2013. ECF No. 1.  In it, Plaintiffs brought a claim under NEPA and the judicial review procedures of the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq., and a claim under the MBTA and the APA.  Id., at ¶¶ 115-22.  On May 28, 2013, Plaintiffs moved for a preliminary injunction, on which the Court heard oral argument on June 28 and denied on July 3.  ECF Nos. 17, 51 & 53.

Defendants moved separately to dismiss the initial complaint in July.  ECF Nos. 54 & 55. Plaintiffs then filed an Amended Complaint on July 26, 2013.  ECF No. 56.  The Amended Complaint deleted Plaintiffs' cause of action under the MBTA, and now brings a single claim for relief under NEPA and the APA.  Id., ¶¶ 123-27.

> The APA contains two separate provisions for judicial review of federal agency action. The more familiar avenue is through Section 706(2), which permits, *inter alia*, a reviewing court to set aside an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." § 706(2)(a). Section 706(2) only applies to a "final agency action[s]," and therefore it generally occurs when an agency has made some final written reviewable determination, presumably after utilizing its pertinent expertise. Courts, including the Ninth Circuit, "have upheld agency use of SIRs [Supplemental Information Reports] and similar procedures for the purpose of determining whether new information or changed circumstances require the preparation of a supplemental EA or EIS." Idaho Sporting Cong. Inc. v. Alexander, 222 F.3d 562, 566 (9th Cir.2000).
>
> On the other hand, "when a court is asked to review agency inaction before the agency has made a final decision, there is often no official statement of the agency's justification for its actions or inactions." San Francisco BayKeeper v. Whitman, 297 F.3d 877, 886 (9th Cir.2002).  In such cases, review is available through Section 706(1), through which a reviewing court may "compel agency action unlawfully withheld or unreasonably delayed."

Inj. Order, at 10:26-11:14, 2013 WL 3355657, at *5-6.

The Amended Complaint describes four ways in which Plaintiffs claim that Defendants have violated NEPA and the APA:

(1) by "failing to carry out the decisions, measures, and conditions committed to in the

3

final EIS and the [Record of Decision]," violating 5 U.S.C. § 706(1) ("Section 706"). Am. Complaint, ¶ 124;

(2) by "failing to prepare, or in the alternative, deciding not to prepare a supplemental EIS," violating both Sections 706(1) & 706(2). Am. Complaint, ¶ 125;

(3) by failing to "insure that . . . significant new environmental information . . . is available to public officials and citizens "to the fullest extent possible," in violation of Sections 706(1) and (2). Am. Complaint, ¶ 126;

(4) "[t]o the extent that Defendants' May 1 and April 23, 2013, letters are construed as rejecting Plaintiffs' requests that Defendants engage in supplemental NEPA analysis, those rejections are arbitrary, capricious, and contrary to law," violating Section 706(2). Am. Complaint, ¶ 126.[1]

On July 29, FHWA wrote to Plaintiffs' counsel stating that "FHWA and Caltrans [had] been considering [Plaintiffs'] request for some time, but have not yet made a final decision as to whether a SEIS is required." Exh. 1-A to Declaration of Vincent P. Mammano ("Mammano Decl."), ECF No. 67-1. The letter informed Plaintiffs' counsel that FHWA would undertake a re-evaluation pursuant to FHWA's regulations, 23 C.F.R. § 771.129, "to determine whether a SEIS should be prepared as a result of improperly installed netting at the two bridges," and requested Plaintiffs to "promptly provide Caltrans with any additional information [they] believe supports [the] request that [FHWA] prepare a SEIS." Id.

On August 16, 2013, Plaintiffs provided an extensive response with supporting documentation. Id. at ¶ 4. Defendants believe it will take approximately 120 days from the filing of its motion to complete the re-evaluation and issue a final decision as to whether a SEIS is required. Id. at ¶12.[2]

Defendants have now moved to stay all proceedings in this action for 120 days, until such time as the reevaluation is completed. Plaintiffs have filed an opposition brief in which they agree

---

[1] The Court refers to these as Plaintiffs' "four theories."

[2] This estimate was presented before the federal government shutdown, which began on October 1 and continues as of the date of this order.

4

that a stay of 60 days would be appropriate, but oppose any longer stay. The matter was set for hearing on October 3, 2013. Due to the lapse of appropriations to the U.S. Department of Justice, the Federal Defendants moved to stay or continue the hearing on the motion. The Court continued the hearing one week. Thereafter, and in response to the Court's request, the Federal Defendants indicated that since funding had not been restored, their counsel would not attend the continued hearing.[3] The Court then vacated the hearing and took the matter under submission.

### B.     Jurisdiction

Since the Amended Complaint's cause of action arises under a federal statute, this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

### C.     Legal Standard

"[T]he decision to grant a stay . . . is 'generally left to the sound discretion of district courts.'" Ryan v. Gonzales, ___ U.S. ___, 133 S. Ct. 696, 708 (2013) (quoting Schriro v. Landrigan, 550 U.S. 465, 473 (2007)). However, "[t]he proponent of a stay bears the burden of establishing its need," and issuing a stay without taking any account the nonmovant's interests in proceeding can be an abuse of discretion. Clinton v. Jones, 520 U.S. 681, 708 (1997). In determining whether to stay proceedings," courts generally "consider[] the following factors: (1) judicial economy; (2) the moving party's hardship; and (3) potential prejudice to the non-moving party." Single Chip Sys. Corp. v. Intermec IP Corp., 495 F. Supp. 2d 1052, 1057 (S.D. Cal. 2007)

## III.   ANALYSIS

In deciding whether to stay this case, the Court is primarily concerned with how a stay might prejudice the parties and secondarily with considerations of judicial economy (in particular, whether the Court will end up adjudicating soon-to-be-mooted claims or claims that are not ripe under the prudential ripeness doctrine).

---

[3] The Federal Defendants moved to stay or continue the October 3 hearing because of the lapse of funding to the Department of Justice, but have not moved to stay all proceedings in this case on that basis, perhaps because a motion to stay was already pending before this Court. However, the Court has also considered the lapse of appropriations in evaluating the present motion. Given the fact that time is of the essence in this case, and the fact that an indefinite stay could potentially prejudice Plaintiffs, the Court will not stay this case because of the lapse of appropriations.

Plaintiffs note persuasively that it is unclear why Defendants are only beginning their reevaluation now, and not much earlier. Defendants respond that "[t]his argument has no logical connection to how much time is required to complete the analysis currently underway." Reply Brief, ECF No. 70, at 10-11. Such a response suggests that the Court should close its eyes to the fact that Defendants propose to complete their initial determination of whether to prepare a SEIS nine months after problems at the Bridges first came to their attention.[4]

The Court is concerned that too long a stay might deprive Plaintiffs of a meaningful opportunity for judicial consideration of their claims before their asserted injury becomes a *fait accompli*. Specifically, it would prejudice Plaintiffs significantly if their claims remained unadjudicated before the swallows return to the Bridges this upcoming Spring. Since these issues have been pending since at least March of this year, it is hard to believe that such a result is inevitable. The Court is unwilling to order a stay if it would deprive Plaintiffs of an opportunity that would otherwise present itself between October and December to avoid that situation.

On the other hand, it is not entirely clear that the process proposed by Plaintiffs would be an efficient use of judicial resources. For example, to the extent that Plaintiffs seek to compel the completion of the reevaluation process, it is unclear whether the Court could order that relief before Defendants propose to have already completed it. In addition, it is not clear whether any claims under Section 706(2) are likely to be ripe this month, if, as seems quite likely from the Defendants' submissions and from subsequent events, no reevaluation is completed then.

There are risks to the Court, and to Plaintiffs, of Plaintiffs seeking relief now instead of waiting for the reevaluation to issue. But since these risks are outweighed by the risk of prejudice to Plaintiffs, and by Plaintiffs' interest in moving forward, the Court will deny the request for a stay. However, the Court will require Plaintiffs to file a motion for leave to file a summary judgment motion in order to ensure that there is good cause to entertain such a motion at this time. The required contents of the motion for leave are listed below:

---

[4] Defendants' brief could also be read to contain an implied threat to delay completion of the reevaluation if the Court does not give Defendants the stay they want. See Motion, ECF No. 67, at 10:9-14. That portion of Defendants' argument is not well taken.

1. Plaintiffs must identify on which of the "four theories" they will seek summary judgment.[5] With respect to the second and third theories, the motion must identify whether the motion for summary judgment will seek relief under Section 706(1), Section 706(2), or both subsections.

2. If Plaintiffs seek relief under any theory pursuant to Section 706(2), the motion must identify the "final agency action" Plaintiffs seek to challenge, explain why the action challenged qualifies as such, and why a claim under Section 706(2) is currently ripe for adjudication in the absence of a completed reevaluation and in light of the Federal Defendants' apparent clarification that they have not determined whether to prepare a Supplemental EIS. Specifically, if Plaintiffs seek relief under their fourth theory (Am. Complaint at ¶ 126) under Section 706(2), they must explain why that claim is not now moot given Defendants' clarification that the March and April letters are not, in fact, final determinations that a Supplemental EIS is unnecessary.

3. If Plaintiffs seek relief under any theory pursuant to Section 706(1), the motion must identify with specificity which agency action or actions Plaintiffs claim have been "unlawfully withheld or unreasonably delayed." Specifically, with regard to Plaintiffs' second theory, Plaintiffs must explain whether they will argue that the Defendants have "unlawfully withheld or unreasonably delayed" the *reevaluation*, the *Supplemental EIS*, or both. If Plaintiffs argue that the Supplemental EIS has been unlawfully withheld or unreasonably delayed, they must explain the basis of their belief that an agency is required to prepare a Supplemental EIS even before it has completed its determination of whether new information is significant.

4. Plaintiffs must identify the relief they will request, when that relief would likely be granted, and why that relief is not likely to be mooted shortly thereafter by the issuance of a reevaluation. For example, if Plaintiffs are entitled to summary judgment that the reevaluation has been unlawfully withheld or unreasonably

---

[5] The Court does not suggest that Plaintiffs are limited to only one.

    delayed, what relief could the Court order that would not be mooted by the issuance of a reevaluation?

5. Plaintiffs must explain whether or not an administrative record must be prepared before the Court can consider the claims they will bring, and must explain the basis for that opinion. If Plaintiffs believe an administrative record is required, they should propose a timeline for its preparation and explain how it will relate to the timeline for summary judgment briefing.

The Court grants all Defendants leave to file opposition briefs not more than seven days from the date that Plaintiffs submit their motion for leave to file a summary judgment motion. The focus of the Court's inquiry is whether there is good cause to entertain a summary judgment at this time, and not whether the motion will ultimately be successful. However, the parties are encouraged to provide limited citation to authority where necessary to explain the basis of their positions.

## IV. CONCLUSION

The Court hereby DENIES the motion for a stay, and ORDERS all parties to continue litigation in this case. As described *supra*, Plaintiffs may file a motion for leave to file a summary judgment motion as of the date of this order.

**IT IS SO ORDERED.**

Dated: October 11, 2013

                      _____
                        JON S. TIGAR
                      United States District Judge